UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                 :

FRANK BELLEZZA,                                         :

                                                                 :         09 Civ. 8434 (PAE)

                                       Plaintiff,          :

                                                                  :         <u>OPINION & ORDER</u>

                    -v-                                               :

D. HOLLAND et al.,                                      :

                                                      Defendants.   :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Plaintiff Frank Bellezza brings this *pro se* action pursuant to 42 U.S.C. § 1983, alleging that defendant Douglas Holland, a prison employee, infringed his First Amendment right to the free flow of mail. Holland moves for summary judgment under Federal Rule of Civil Procedure 56. For the reasons that follow, that motion is granted.

## I.    Background[1]

      Except as otherwise noted, the following facts are not disputed. Frank Bellezza is an inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Am. Compl. ¶ 4. During the time period relevant here, he was incarcerated at the Woodburne Correctional Facility ("Woodburne"). Bellezza Decl. ¶ 8.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' pleadings and their submissions in support of and in opposition to the instant motion—specifically, the Declaration of Douglas Holland ("Holland Decl.") (Dkt. 55) and attached exhibits; the Declaration of Brenda Clark ("Clark Decl.") (Dkt. 54) and attached exhibits; the Declaration of Kevin Harkins ("Harkins Decl.") (Dkt. 56) and attached exhibits; the Declaration of Frank Bellezza ("Bellezza Decl.") (Dkt. 61); Defendant's Local Rule 56.1 Statement of Material Fact ("Def. 56.1") (Dkt. 57); and Plaintiff's Local Rule 56.1 Statement of Material Fact ("Pl. 56.1") (Dkt. 59). Citations to a party's 56.1 statement incorporate by reference the documents cited therein.

Douglas Holland is a senior investigator employed by DOCCS. Holland Decl. ¶ 1. Brenda Clark is a senior mail clerk employed by DOCCS; she currently works at Woodburne, and is responsible for processing incoming mail. Clark Decl. ¶¶ 1, 3.

Two directives govern the processing of mail that comes into Woodburne. Clark Decl. ¶ 3; Pl. 56.1 ¶ 7. All incoming general mail is governed by Directive 4422, Clark Decl. ¶ 5; *id.* Ex. B ("Dir. 4422"); it must be opened and inspected for cash, checks, or any form of contraband. Dir. 4422 § III(G)(1)(B). General mail may be inspected outside of the inmate's presence. *Id.* Directive 4421, on the other hand, governs all "privileged correspondence," which is defined as mail addressed by an inmate to, or to an inmate from (1) any governmental or public official; (2) an attorney or legal representative; or (3) any medical personnel. Clark Decl. ¶ 4; *id.* Ex. A ("Dir. 4421"). Incoming mail that is determined to be privileged must be logged and opened in the presence of the inmate. Dir. 4421 § 721.3(b). In the event that a piece of privileged correspondence is not clearly identified as such, and thus is opened outside the presence of the inmate, it must be logged and the envelope attached to its contents so that the inmate can see that the mail could not be identified as privileged. *Id.*

On or about March 23, 2009, Clark processed a bulk envelope that was not addressed to any single inmate. Clark Decl. ¶ 7; Pl. 56.1 ¶ 14. Clark testified that there was nothing on the face of the package to indicate that it contained privileged mail. Clark Decl. ¶ 7. Bellezza disputes that assertion, because during discovery he was not provided with a copy of the envelope. Pl. 56.1 ¶ 15. Clark opened the package and found four smaller envelopes inside, each addressed to a different inmate. Clark Decl. ¶ 7; Pl. 56.1 ¶ 16. Due to what Clark described as the "unusual" nature of the package, she gave it to a supervisor; Clark had no further involvement with the package. Clark Decl. ¶ 7.

2

Each of the four envelopes contained a settlement check for the case of *Wilson v. Airborne, Inc.*—a consumer class action against the makers of the over-the-counter vitamin supplement Airborne. Holland Decl. ¶ 5; *id.* Ex. A; Pl. 56.1 ¶ 18. One such check was made out to Bellezza, in the amount of $55.98. Holland Decl. Ex. A. Airborne is considered contraband at Woodburne. Holland Decl. ¶ 6 n.2; Pl. 56.1 ¶ 20.

On March 24, 2009, Lieutenant S. Katz sent a memo to Superintendent Raymond Cunningham stating that Katz, as Cunningham had requested, had interviewed each of the four inmates to whom the settlement checks had been addressed, including Bellezza. Holland Decl. Ex. B. According to Katz, Bellezza denied ever having used Airborne, and claimed that he bought it as a gift for a friend. *Id.* Bellezza's account is consistent with Katz's; Bellezza stated that he "informed Katz that he purchased Airborne products as gifts through outside purchases, and had the product sent directly to family members and friends." Bellezza Decl. ¶ 12. In his deposition, Bellezza testified that, during the interview, Lt. Katz's "main concern was that he wanted to know whether or not I possessed the Airborne medication inside the facility." Harkins Decl. Ex. B ("Bellezza Dep.") at 29.

On March 24, 2009, Cunningham sent a memo to the deputy commissioner of the New York Inspector General's office, attaching Katz's memo and stating that:

> [F]our (4) inmates . . . have received settlement checks . . . for use of a product that they clearly were not entitled to have and did not possess. As they were clearly in a correctional facility during the time period this product was recalled, to me this amounts to fraud and I am reluctant to release the checks.

Holland Decl. Ex. E. Cunningham requested that the Inspector General's office conduct an investigation. *Id.*

Holland was assigned to conduct the investigation. He testified that its goal was to determine whether the four inmates had actually purchased Airborne, whether they were eligible

3

to partake in the class action settlement, and if not, whether they had committed fraud in connection with the class action. Holland Decl. ¶ 7; Pl. 56.1 ¶¶ 23–24.

On or about April 13, 2009, Holland interviewed Bellezza as part of that investigation. Holland Decl. ¶ 8; Bellezza Decl. ¶ 18. Holland testified that Bellezza told him that he had purchased Airborne as gifts for relatives within the last three or four years. Holland Decl. ¶ 8. Holland then examined the previous five years of Bellezza's inmate account statements. He found that, contrary to Bellezza's claim, they did not reflect any outside purchases of Airborne. *Id.* Bellezza has been continuously incarcerated since 1997. *Id.* ¶ 9.

Bellezza, however, asserts that he told Holland during that interview that he was unsure of the exact dates of his Airborne purchases. Pl. 56.1 ¶ 26. Bellezza testified that he later determined, after checking written records he kept in his cell, that the exact date on which he purchased Airborne was in November 2001—outside the five-year period for which Holland examined Bellezza's account statements. Bellezza Decl. ¶ 18. DOCCS does not maintain inmate account statements beyond a period of five years, *id.* ¶ 21, and Bellezza has not produced the written records that he kept in his cell, which purportedly enabled him to ascertain the date of his Airborne purchase.

Based on his finding that Bellezza had been ineligible to participate in the class action, Holland issued an Inmate Misbehavior Report. Holland Decl. ¶ 8. At the ensuing disciplinary hearing, Bellezza claimed to have purchased the Airborne in 2001 from Maggy's Pharmacy in Dannemora, New York, through its mail order catalog. *Id.* Holland, however, stated that he contacted Maggy's Pharmacy, and was told that it does not issue a mail order catalogue, and that,

4

in 2001, the pharmacy did not carry Airborne.  *Id.*[2]  Holland attempted to contact the claims administrator for the Airborne class action to inform him of the situation, but failed.  *Id.* ¶ 10.  Accordingly, pursuant to Directive 410 § (VI)(D)(1), Holland turned Bellezza's settlement check over to the State Treasury, and it was ultimately deposited in the Crime Victim's Fund.  *Id.* ¶ 10; *id.* Ex. G.

On or about April 14, 2009, Bellezza received an application to participate in another class action, which the parties refer to as the "Track 1 AWP" class.  Holland Decl. ¶ 9; Pl. 56.1 ¶ 32.  Bellezza's Amended Complaint in this action claims that he was a legitimate member of this class.  Am. Compl. ¶ 12.  However, Bellezza now states that he determined that he was not a proper class member, and accordingly did not file a claim.  Bellezza Decl. ¶ 37.  Bellezza alleges that Clark opened, copied, and withheld correspondence related to the Track 1 AWP class action.  Am. Compl. ¶ 13.  He also asserts that Holland "has and may continue to have the class action packets opened, read and photocopied" and that Holland ordered that "all future settlement checks will be confiscated."  Bellezza Decl. ¶ 39.  Holland, by contrast, testifies that the only mail he has ever withheld from Bellezza was the Airborne settlement check.  Holland Decl. ¶ 12.

## II.  Procedural History

On October 5, 2009, Bellezza filed a Complaint in this case against several defendants.  Dkt. 1.  On February 19, 2010, defendants filed a motion to dismiss.  Dkt. 12.  On July 30, 2010, Judge Robert W. Sweet, who was then assigned to the case, granted that motion in its entirety, but granted Bellezza leave to file an amended complaint.  Dkt. 18.

On August 18, 2010, Bellezza filed an Amended Complaint, alleging violations of § 1983 by defendants Holland and Clark.  Dkt. 19.  On October 11, 2010, defendants filed a motion to

---

[2] Bellezza nevertheless maintains that he purchased the Airborne from Maggy's Pharmacy.  Pl. 56.1 ¶¶ 29, 31.

dismiss the Amended Complaint. Dkt. 22. On July 12, 2011, Judge Sweet granted that motion in part, but denied it as to Bellezza's claim that defendants violated his First Amendment right to the free flow of mail. Dkt. 28. On October 3, 2011, the case was reassigned to this Court. Dkt. 29. On August 9, 2012, Bellezza voluntarily dismissed his claim against Clark, leaving Holland as the only remaining defendant. Dkt. 51. On August 24, 2012, Holland filed a motion for summary judgment. Dkt. 52. On September 11, 2012, Bellezza filed an opposition. Dkt. 60. On October 12, 2012, Holland filed a reply. Dkt. 63.

### III. Legal Standard

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over "facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."

6

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In considering Holland's motion, the Court is mindful that Bellezza is a *pro se* litigant whose submissions must be construed to "raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted). However, this forgiving standard "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted).

## IV.  Discussion

### A.  Bellezza's First Amendment Claim

"[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Under *Turner*, courts must evaluate four factors in making this determination:

> [1] whether the challenged regulation or official action has a valid, rational connection to the legitimate government objective; [2] whether prisoners have alternative means of exercising the burdened right; [3] the impact on guards, inmates, and prison resources of accommodating the right; and [4] the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests.

*Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (citing *Turner*, 482 U.S. at 90–91). "The first *Turner* 'factor' is more properly labeled an 'element' because it is not simply a consideration to be weighed but rather an essential requirement." *Id.* (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)).

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). "Restrictions on prisoners' mail are justified only if they further one or more of the substantial governmental

7

interests of security, order, and rehabilitation[,]" and such restrictions "must be no greater than [are] necessary or essential to the protection of the particular governmental interest involved." *Ahlers v. Rabinowitz*, 684 F.3d 53, 64 (2d Cir. 2012) (quoting *Davis*, 320 F.3d at 351 (citation and alterations omitted)). "In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).

"[A] prisoner has a right to be present when his legal mail is opened." *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 574–76 (1974)). However, an isolated incident of tampering with legal mail "is usually insufficient to establish a constitutional violation. Rather, the inmate must show that prison officials regularly and unjustifiably interfered with the incoming legal mail." *Ahlers*, 684 F.3d at 64 (quoting *Davis*, 320 F.3d at 351 (citation omitted)). As few as two incidents of mail tampering can constitute an actionable violation "(1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

Here, Bellezza claims that Holland violated his First Amendment right to the free flow of mail by opening, reading, photocopying, and withholding Bellezza's privileged legal correspondence outside his presence on at least two separate occasions: (1) when Holland withheld the Airborne settlement check; and (2) when Holland allegedly instructed other employees to open and/or withhold correspondence regarding the Track 1 AWP action. Pl. Br. 1–2. Bellezza also contends that Holland chilled his participation in future litigation by allegedly

putting in place, and then subjecting him to discipline under, an informal policy under which prisoners must first receive permission from DOCCS officials and establish the validity of their claims to prison officials before filing claims for compensation in litigation. *Id.*

### 1. *The Airborne Check*

It is undisputed that Holland (1) investigated Bellezza's participation in the Airborne class action and (2) ultimately withheld Bellezza's settlement check. The question is whether, assuming *arguendo* that these actions infringed on Bellezza's First Amendment rights, each furthered a substantial government interest in a way that imposed no greater restriction on Bellezza's First Amendment rights than necessary. *Ahlers*, 684 F.3d at 64.[3]

It is undisputed that the investigation into Bellezza's participation in the Airborne settlement was initially motivated by an interest on the part of prison officials in determining whether Bellezza had possessed contraband inside the prison. *See* Bellezza Dep. 29; Holland Decl. Exs. C, D. Detecting and deterring the presence of contraband in a prison facility is a legitimate penological interest. *See, e.g.*, *Florence v. Bd. of Chose Freeholders*, 132 S. Ct. 1510, 1517 (2012); *Benjamin v. Coughlin*, 905 F.2d 571, 578 (2d Cir. 1990); *see also Webster v. Mann*, 917 F. Supp. 185, 187 (W.D.N.Y. 1996) (discovering contraband is a legitimate penological interest, to which Directive 4422 is reasonably related). And Holland's actions in questioning Bellezza about whether he had purchased Airborne and possessed it within the facility are, undoubtedly, rationally related to the interest in detecting contraband and no more restrictive than necessary to further that interest. *Cf. Florence*, 132 S. Ct at 1516–17 (finding suspicionless strip search of detainee arrested on non-serious crime conducted prior to his introduction into the

---

[3] The initial opening of Bellezza's legal correspondence, and the directive under which that was justified, are *not* at issue here. That is because it was Clark who first opened Bellezza's mail and discovered the Airborne check, and she has been dismissed from this case.

general jail population "reasonably related to legitimate security interests," including preventing smuggling of contraband); *Webster*, 917 F. Supp. at 187 (opening incoming mail reasonably related to interest in detecting contraband).

However, as Bellezza correctly observes, Pl. Br. 3, at some point during Holland's investigation the penological interest at stake changed. Once Holland and other officials had determined that Bellezza did not possess Airborne inside the prison, the penological interest in detecting and deterring the presence of contraband was no longer relevant. Instead, to be valid, Holland's continued investigation and ultimate retention of the Airborne settlement check must have furthered some other legitimate interest.

Holland argues that these actions furthered the "valid and legitimate" interest in "preventing an inmate from defrauding the court and . . . benefit[ting] financially based on false statements." Def. Br. 10. Although Holland cites no case support for the proposition that this is a legitimate penological interest, such case support does exist. In *Rodriguez v. James*, 823 F.2d 8 (2d Cir. 1987), the Second Circuit addressed a challenge to a regulation requiring that all business mail sent by prisoners to commercial firms be submitted in unsealed envelopes and be subject to inspection, and that inmates send advance payment in the form of a check. These requirements were devised in response to instances in which inmates had ordered merchandise without sufficient funds to make payments. *Id.* at 10. Upholding the regulation, the Second Circuit stated: "The legitimacy of the state's interest in preventing fraud or profligacy by inmates, and thereby promoting the penological objectives of 'security, order, and rehabilitation,' cannot seriously be questioned." *Id.* at 12 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). The Court added: "An inmate who seeks to defraud a business is engaging in conduct that is both illegal and at odds with the rehabilitative goals of incarceration." *Id.*

This principle is equally applicable where an inmate seeks to defraud the parties to a class action settlement. After determining that Bellezza had not purchased Airborne within the last 5 years, Holland had a justifiable suspicion that Bellezza might be seeking to defraud the class by making a false claim for compensation. His ensuing investigation, therefore, furthered the legitimate penological interest in preventing such fraud. *See id.*; *see also Woods v. Comm. of the Ind. Dep't of Corr.*, 652 F.3d 745, 748 (7th Cir. 2011) (policy designed to prevent prisoners from developing relationships with outside persons only to defraud them by inducing financial contributions is a legitimate governmental objective); *Lena v. DuBois*, 19 F.3d 1427 (1st Cir. 1994) (table) (preventing inmate fraud on businesses is a legitimate penological interest); *Neree v. O'Hara*, No. 9:09-CV-802 (MAD/ATB), 2011 WL 3841551, at *8 (N.D.N.Y July 20, 2011) (Report & Rec.) (policy designed to prevent prisoners from filing fraudulent liens against prison officials furthers legitimate penological objective), *adopted by* 2011 WL 3841553 (N.D.N.Y. Aug. 29, 2011); *Argentino v. Domire*, No. 09-4217-CV-C-SOW, 2012 WL 27672, at *3 (W.D. Mo. Jan. 4, 2012) (preventing fraud on the public is a legitimate government interest); *Canadian Coal. Against the Death Penalty v. Ryan*, 269 F. Supp. 2d, 1199, 1202 (D. Ariz. 2003) (same).

The Court, accordingly turns to the question whether Holland's actions—conducting the investigation and ultimately retaining the settlement check—were reasonably related to the legitimate goal of preventing inmate fraud. The four *Turner* factors guide this inquiry. *See Turner*, 482 U.S. at 89–91.

There is, clearly, a "valid, rational connection" between both Holland's investigation and retention of the settlement check, on the one hand, and the goal of preventing fraud, on the other. Without such an investigation, prison officials could not have determined whether Bellezza was committing fraud; if Holland was correct that Bellezza was committing fraud, withholding the

check prevented the fraud from reaching fruition. *See Rodriguez*, 823 F.2d at 12 (rational connection exists between directive allowing opening of business mail and goal of preventing fraud because otherwise "[p]rison officials cannot ascertain whether an inmate is attempting to perpetrate a fraud"); *see also Woods*, 652 F.3d at 749 ("A prohibition on advertising for pen-pals relates fairly directly to the goal of preventing fraud since it cuts off inmates' access to potential victims.").

The second and fourth *Turner* factors, which examine whether there are alternative means for the prisoner to exercise the burdened right and whether an alternative restriction might have a lesser impact on the penological interest at stake, *see Turner*, 482 U.S. at 90–91, do not assist Bellezza, either. In considering these factors, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Here, once it was determined that Bellezza had not purchased Airborne, Holland necessarily knew that a real possibility existed that Bellezza was committing fraud in connection with the class action settlement. Holland thereafter reasonably investigated whether Bellezza had a legitimate basis for submitting a claim for compensation in the class action, and, finding that Bellezza had no valid claim, legitimately withheld his settlement check.

Bellezza does not propose any concrete alternative action that Holland could have taken that would have imposed less of a burden on Bellezza's rights without materially disserving the legitimate penological interest at stake. Conceivably, Holland could have taken other steps as part of his investigation into whether Bellezza had a legitimate basis for putting in a claim for compensation based on purchases of Airborne, but, in the Court's estimation, Holland had a

satisfactory basis for determining that Bellezza's claim was bogus. Given that, it is not for the Court to micromanage the techniques used by a prison investigator to reach that determination.[4]

For these reasons, the Court finds that there is no genuine issue of material fact as to whether Holland's actions regarding the Airborne settlement check were reasonably related to a legitimate penological interest.

### 2. *The Track 1 AWP Mail*

Bellezza's Amended Complaint alleges that Clark withheld correspondence regarding the Track 1 AWP class. Am. Compl. ¶ 13. But Clark has been dismissed from this case, and Bellezza concedes that the one remaining defendant, Holland, confiscated only the Airborne settlement check from him. Pl. Br. 7. Nevertheless, Bellezza declares that "Holland basically confesses in his pleadings, and the evidence strongly suggest [sic] that Defendant Holland, as part of his investigation had the [Track 1 AWP] class action information packet opened, read, and photocopied outside of Plaintiff's presence." *Id.* Thus, considering Bellezza's submissions in the light most favorable to him, the Court interprets Bellezza's claim as an argument that Clark may have withheld this correspondence from Bellezza at Holland's behest. *Id.* at 2.

That claim cannot stand. Bellezza has not presented any evidence that Holland gave (or was authorized to give) such an order. Bellezza's supposition that Holland did so is just that—a supposition founded only on speculation. However, it is apparent, based on Holland's testimony that he questioned Bellezza regarding his participation in the Track 1 AWP class, that Holland, at some point, either saw the Track 1 AWP correspondence or a copy thereof. Holland Decl. ¶ 9. Thus, although neither party has presented any evidence as to the ultimate fate of the Track 1

---

[4] The third *Turner* factor—the impact on guard, inmates, and prison resources of accommodating the right—is not relevant here, as no party has suggested such an accommodation.

AWP information packet, there is at least some evidence on which a reasonable jury might find a delay or some disruption in Holland's access to this correspondence.

However, even assuming the most extreme facts—that Holland had personally withheld the Track 1 AWP information packet from Bellezza—this would not give rise to an actionable § 1983 violation on the facts at hand.  As explained above, prison officials have a valid interest in preventing inmates from defrauding class action settlements.  Holland testified that he questioned Bellezza about the Track 1 AWP correspondence in connection with his investigation regarding the Airborne check, and that in doing so Holland determined that it would have been impossible for Bellezza to be eligible for participation in that class action, because he was incarcerated during the relevant period.  Holland Decl. ¶ 9.  Bellezza, at least in his more recent submission, does not contest that he was ineligible to participate in the Track 1 AWP class.  *See* Bellezza Decl. ¶ 37 (acknowledging that he was not a proper class member); *but see* Am. Compl. ¶ 12 (alleging that he was a proper class member).  Withholding a claims packet for a class action for which a prisoner is manifestly ineligible to participate is rationally related to the legitimate penological interest in preventing inmate fraud, because doing so helps to prevent the prisoner from submitting a false claim.  *See Neree*, 2011 WL 3841551, at *8 (policy whereby inmates need permission to obtain UCC forms needed to file liens is reasonable and directly related to goal of preventing filing of false liens); *Woods*, 652 F.3d at 748 (restriction on advertising for pen-pals is reasonable and relates fairly directly to goal of preventing fraud since it cuts off inmates' access to potential victims); *Lena*, 19 F.3d at 1427 (pre-payment requirement reasonably related to goal of preventing prisoners from committing fraud on businesses).  Therefore, regardless of whether Holland briefly read the Track 1 AWP information packet or

permanently withheld it from Bellezza, there is no genuine issue of material fact whether these actions were reasonably related to a legitimate penological goal.[5]

### 3. *Holland's Alleged Policy*

Finally, Bellezza alleges that Holland created a policy "requiring inmates to get permission from the facility superintendent before corresponding with settlement administrators, participating in civil litigation, or receiving court authorized settlement funds" and requiring inmates to "prove their legal claims to the [DOCCS] before raising same in a legal claim." Am. Compl. ¶¶ 17–18. In response, Holland presents several inmate grievance complaints in which Bellezza made such a claim, only to be told that no such policy exists. *See* Holland Decl. Exs. I–L. In his deposition, Bellezza conceded that no such official policy exists. Bellezza Dep. 34. Rather, Bellezza's claim appears to be that Holland informally put such a policy into place, and then disciplined Bellezza for violating it. Pl. Br. 2.

The record at summary judgment is clear that Bellezza was disciplined in connection with the Airborne settlement check. Bellezza now construes Holland's attempt to determine the validity of his class action claim as revealing a broad policy that inmates must prove their legal claims to DOCCS before raising them elsewhere. But such an interpretation has no basis in the evidence and rests on a misconstruction of the relevant sequence of events. First, Bellezza filed a claim in the Airborne class action. When his settlement check arrived in the mail, prison officials began an investigation into whether he had purchased Airborne, based on the legitimate concern—initially unrelated to the validity of his class action claim—that Bellezza had possessed contraband in the prison. In the course of determining that Bellezza had not possessed Airborne,

---

[5] Bellezza also alleges that: "Holland ordered the staff at [Woodburne] to confiscate all future settlement checks as part of an ongoing Inspector General's Investigation [sic]." Pl. Br. 7. However, Bellezza has supplied no evidence in support of this broad claim.

the concern arose that Bellezza had made a fraudulent claim for compensation in the class action. Only at this point did Holland seek to confirm the validity of Bellezza's claim (rather than turn a blind eye to this apparent fraud). Bellezza has presented absolutely no evidence supporting his thesis that Holland's motivation was otherwise, or that Holland has, *sub silentio*, put in place a policy whereby all legal claims must first be established to DOCCS's satisfaction before being made elsewhere. Although the standard on this motion for Bellezza, as a *pro se* litigant, is forgiving, it does not relieve him of his duty to present *some* evidence of his assertions. *See Jorgensen*, 351 F.3d at 50.

In sum, although there is evidence of two instances of interference with Bellezza's mail, on the summary judgment record, there is no basis to dispute that both instances were reasonably related to important penological interests, and Bellezza's claim that these instances were part of a wider practice of censorship by Holland is not supported by evidence on which a reasonable jury could make such a finding. Therefore, there is no genuine issue of material fact as to Holland's liability, and summary judgment in his favor is merited.

### B.  Qualified Immunity

Holland argues, in the alternative, that even if his interference with Bellezza's mail was improper, he is entitled to qualified immunity. "[Q]ualified immunity . . . is sufficient to shield executive employees from civil liability under § 1983 if either '(1) their conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that their acts did not violate these clearly established rights.'" *Cornejo v. Bell*, 592 F.3d 121, 128 (2d Cir. 2010) (quoting *Young v. Cnty. of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998) (citation and alterations omitted)).

Having found no violation of Bellezza's constitutional rights, the Court need not reach the issue of qualified immunity. However, even if a genuine issue of material fact existed as to whether Bellezza's constitutional rights were violated, the Court would nonetheless find that Holland is entitled to qualified immunity, because reasonable officials could disagree about whether Holland's actions violated Bellezza's First Amendment rights. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (qualified immunity protects government officials "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated"). It was objectively reasonable for Holland to conclude that investigating potentially fraudulent class action claims, and withholding compensation checks that derived from such fraudulent claims, were permissible steps for a prison official to take. Accordingly, Holland is also entitled to summary judgment on this alternative ground.

## CONCLUSION

For the reasons stated herein, defendant's motion for summary judgment is hereby GRANTED. The Clerk of Court is directed to terminate the motion at docket item 52 and to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: November 7, 2012
       New York, New York